## HOLMES *v.* ROPER *et al.*

### *(Supreme Court, General Term, Fourth Department. May 2, 1890.)*

1. NEGOTIABLE INSTRUMENTS—EXECUTION—FORGERY.

   In an action upon a note purporting to have been executed to plaintiff by defendants' intestate, and to be payable after intestate's death, it appeared that plaintiff was a nephew of the intestate, that he had no property, and had had no business transactions with intestate of any significance. Experts testified against the genuineness of the signature to the note after comparison with known signatures. But other witnesses gave contradictory testimony after a similar comparison, and it was shown that plaintiff's father had been in partnership with intestate. *Held*, that a decision against the defense of forgery would not be disturbed.

2. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

   On conflicting evidence, the jury found against defendant on the issues of forgery, duress, and no consideration. Affidavits supporting a motion for a new trial on the ground of newly-discovered evidence were to the effect that, at about the time and subsequent to the date of the note sued on, the intestate, in the presence

of plaintiff, told several persons that he did not owe a dollar, and that he intended that his property should go to his only child, and that plaintiff did not dissent from such statement. Other evidence to be adduced was to the effect that, after the date of the note, plaintiff had said that his uncle was going to leave him a present when he died. A paper was also discovered after the trial bearing a date prior to the date of the note, and indicating a settlement of all transactions between the intestate and plaintiff's father. *Held*, that the motion should have been granted. MARTIN, J., dissenting.

3. SAME—APPLICATION.

Under Code Civil Proc. N. Y. § 1005, providing that entry, collection, or other enforcement of a judgment does not prejudice a subsequent motion for a new trial, such a motion does not come too late, where the judgment is entered on the 29th day of June, the case is settled and filed and notice of the motion served in the following September, and the motion is heard on the 1st of October.

Appeal from special term, Tioga county.

Action by Jerome D. Holmes against William E. Roper and Eliza W. Roper, administrators, etc., of Job Holmes, deceased. An appeal was taken from a judgment entered against defendants on the 29th day of June, 1889, in Tioga county, for $2,427.84; also from an order confirming the referee's report entered in said county on the 28th day of June, 1889. There was also an appeal from an order denying a motion for a new trial on the ground of newly-discovered evidence granted at the special term in Tioga on the 1st of October, 1889, and entered on the 15th of November, 1889. The plaintiff presented a claim against the administrators of Job Holmes, based upon an instrument of which the following is a copy: "$2,000. CANDOR, September 14, 1885. For value received, I promise to pay Jerome D. Holmes two thousand dollars, thirty days after my death. JOB HOLMES." The claim was rejected by the administrators. An agreement to refer was entered into by the parties, approved by the surrogate of Tioga county, September 4, 1888. The reference was executed, and the referee made a report on the 10th of May, 1889, in which he found that the deceased made his certain promissory note, (being the one described in the claim,) and delivered said promissory note to the plaintiff, and "that said note was so given by said Job Holmes to said Jerome D. Holmes for a good and valuable consideration;" and the referee also found "that there was no undue influence, fraud, or duress practiced or used by any person upon the said Job Holmes, in obtaining from him the said note, or the giving or making of the same, and that the making and delivering of the same was the free act and deed of said Job Holmes, and that the signature thereto is the genuine signature of said Job Holmes; that the said note became due on the 10th day of August, 1887, and remains unpaid." In his conclusion of law he found the plaintiff was entitled to recover, and he ordered judgment for the amount of the note, "besides his reasonable and lawful disbursements in this action."

Code Civil Proc. N. Y. § 1005, provides that entry, collection, or other enforcement of a judgment does not prejudice a subsequent motion for a new trial.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

*Simeon Smith*, for appellants. *Mead & Darrow*, for respondent.

HARDIN, P. J. Having carefully examined the evidence found in the appeal-book relating to the merits of the controversy had before the referee, we find that the evidence is very conflicting. Defendants, upon the trial before the referee, resisted the claim of the plaintiff on the following grounds: *First*, that the note was a forgery; *second*, that, if the note was as a matter of fact signed by Job Holmes, his signature was procured under duress and fraud; *third*, that the note was void, and was without consideration.

1. By the evidence it appears that Job Holmes died July 7, 1887, at about the age of 70 years; that he had been afflicted with paralysis, and for some years before his death was quite infirm. He died intestate, leaving him surviving

his only child, Eliza Roper, who was his only heir; his wife had died several years before his death.   At the time of his death he owned real estate worth about $5,000, and he left about $2,800 in personal estate.   He had for a number of years been in partnership with his brother Rufus Holmes, who is the father of the plaintiff.   Several settlements had been had between the intestate and his brother Rufus.   No business transactions of any significance had ever taken place between the plaintiff and the intestate.   The plaintiff was an invalid to some extent, and possessed of no property.   The body of the note was in the plaintiff's hand-writing.   No witness was produced upon the trial who saw the intestate sign the same.   Plaintiff produced several witnesses, who gave testimony tending to support the claim made by the plaintiff.   Several witnesses expressed the opinion that the signature upon the note was that of the intestate, and some of the witnesses made comparison of the signature upon the note with signatures upon other papers confessedly executed by the intestate.   To confront the testimony of the plaintiff, several witnesses were called on the part of the defendants, who gave testimony tending to indicate that the signature to the note was not the genuine signature of the intestate, and that the note was without consideration.   Among the witnesses called by the defendants was Mr. Ames, "the pen artist," who examined the signature carefully, and compared the same with the signature upon papers confessedly genuine, and he pointed out the dissimilarities in the features of the signature in question with those upon papers confessedly executed by the intestate, and he concluded his testimony in language following: "Taking all these into consideration, to my mind it presents an array of facts that makes it impossible that, at that time, Mr. Holmes made that signature.   I do not believe it is his."   While the referee was called upon to determine whether or not the signature was genuine upon the conflicting evidence, and it may not be said that his finding is against the weight of evidence, still a careful perusal of all the evidence found in the appeal-book has left some doubt upon our minds as to whether or not, if the question were now an original one, we should reach the same conclusion stated by the referee.   However, under all the circumstances, with due consideration of all the evidence found in the appeal-book, giving to the report of the referee such influence as it justly should receive in reviewing the evidence, we do not feel at liberty to reverse the judgment on the ground that the report of the referee is against the preponderance of evidence.

2. We have looked at the exceptions taken during the trial, and we find no error presented by them calling for a disturbance of the report of the referee. It therefore follows that the appeal from the judgment and the order of confirmation of the same must be permitted to stand.

3. We are of the opinion that the court at special term had power, upon hearing the motion for a new trial on newly-discovered evidence, to grant the same, notwithstanding a judgment had been entered.   Code Civil Proc. § 1005; *Tracey* v. *Altmyer*, 46 N. Y. 598.   In *Fisher* v. *Corwin*, 35 Hun, 253, the motion for a new trial was held properly refused because of the laches of the moving party.   In the opinion in that case it is stated, "more than four years elapsed from the time of the entry of the judgment to the making of this motion," and upon this ground the decision seems to have been placed. No reference is made in the case to *Tracey* v. *Altmyer*, *supra*, or to section 1005 of the Code of Civil Procedure.   In the case in hand the motion for a new trial seems to have been made with considerable celerity.   Under the established practice, it could not be heard except upon a case prepared and settled, containing all the evidence given upon the trial.   *People* v. *Superior Court*, 10 Wend. 286; *Sproul* v. *Insurance Co.*, 1 Lans. 71; *Young* v. *Cuddy*, 23 Hun, 250.

The case was settled and filed on the 6th of September, and the notice of motion bears date September 21, and it was served on the 23d of September,

1889, and the motion was heard on the 1st of October, 1889. We think the defendants are not chargeable with laches in making the motion. We must therefore proceed to consider the merits of the motion. It was made upon 18 affidavits. Several of the affiants take back or modify or explain the statements found in their affidavits read in support of the motion. However, the statements of several of the affiants are not disputed, except by the affidavit of the plaintiff. Starkweather states in his affidavit "that, in the fall of the year 1885, he was in the village of Candor one day, and sitting on the stoop of the Allen Hotel, when he saw Job Holmes and his nephew, Jerome D. Holmes, coming down the walk towards him. Job Holmes came up and shook hands with deponent, and sat down near him; his nephew, Jerome, sitting down near him, and within hearing distance. Job Holmes then said to deponent: 'Charles, how are you getting along now days?' I said, 'First rate.' He then said: 'You are getting out of debt; you have a good farm and a good team.' I then replied: 'I calculate to keep so; this trading business does not pay.' He then said: 'I have quit trading and doing business. I have got enough to keep me as long as I live, if I take care of it. I don't care to have any more. I have only one child, and she will get what I have when I am done with it. I owe no man a dollar in this world, and no man holds any papers against me. I haven't but a little while to live, anyhow, and I propose to keep my business in a snug shape.' * * * Deponent further says that said Jerome did not dissent from any statement made by his uncle in his hearing and presence." Peter Herdic states a similar conversation, in substance, to that detailed by Starkweather, and adds: "This conversation was held on the hotel stoop in Candor, in the presence and hearing of Jerome D. Holmes." Edward J. Wright states that on the 16th day of September, 1885, he heard a conversation in which Job Holmes stated that "he was out of debt, and that no man had his name on paper, and what there was left of his property after he was through with it would go to his only heir, his daughter, and that Jerome D. Holmes was sitting a few feet distant, and in hearing distance, during the conversation, and made no dissension from what was said." Daniel Joy states that in May, 1885, he had a conversation with Job Holmes, in which he stated "he owed no man a dollar, and no man had his name on a note or paper of any kind that he knew of. The above conversation took place in the presence of a young man, whom Job Holmes introduced to deponent as Rufus Holmes' son, and whose name deponent understands to be Jerome D. Holmes." Luther Roper states a conversation had with Job Holmes "in the presence and hearing of Jerome D. Holmes," in which he stated that he was "all out of debt, with the exception of a little store bill, or such a matter." W. H. Decker states in his affidavit a conversation which he held with the plaintiff in respect to his uncle Job, in which the plaintiff communicated to the affiant that his uncle "was going to leave him a handsome present when he died; that similar statements were made to deponent at other times, and as late as the year 1886." William Baker details a conversation somewhat similar which he held with the plaintiff.

All these statements made would, if given in evidence, bear directly upon the vital issues passed upon at the hearing. What influence would they have in the determination of the principal questions involved in the controversy? It is not easy to determine that this newly-discovered evidence, if given upon a new trial, would surely produce a different result. We do not overlook the circumstance that the plaintiff in opposing the motion read his affidavit contradicting and explaining the statements found in the affidavits from which quotations have been made. It is not usual to determine upon conflicting affidavits an important question of fact which enters into the determination of the vital issues between litigating parties. Of course, if we were to give full credence to the affidavit of the plaintiff, little weight or force would remain in the affidavits to which we have referred. Whether the affiants affirm

the truth, or the plaintiff correctly states in his affidavit the facts in respect to such conversations, can better be determined after the affiants have been examined and cross-examined, and the plaintiff has been examined and cross-examined; therefore we should not indicate whether the affiants or the plaintiff are entitled to credence. In the affidavit of W. E. Roper, it appears that after the trial he discovered a paper bearing date August 9, 1883, in the house of the deceased, behind the desk, signed by Rufus Holmes, indicating a settlement of all matters between him and the intestate. The absence of that paper seems to be satisfactorily accounted for, and the finding thereof after the trial satisfactorily explained. Because of the severe conflict in the evidence given upon the trial upon the main issues, it is very difficult to say just what influence the newly-discovered evidence will have upon a fresh hearing of the issues. After some considerable reflection, and with a degree of hesitation, we have finally reached the conclusion that the rule stated in *Plate Co.* v. *Barclay*, 48 Hun, 54, should be applied to the case before us. In deciding that case, the court in the first department observed: "What the effect of the testimony of these witnesses might be upon another trial of the action cannot certainly now be determined. It presents a controverted case, in which the jury might adopt either view. There is a probability certainly that they would consider the case of the plaintiff made out rather than that the defense of the defendant was proved. And in this state of the evidence it will be a matter of propriety and justice to submit the case to the hearing and decision of another jury." We think the rule thus stated is more satisfactory than the rule announced in *Behrens* v. *Bloom*, 3 N. Y. Supp. 551, by a special term of the city court, to the effect that the "new evidence is not of that controlling character which carries with it the belief that its presentation at the trial would necessarily change the result." In the *Barclay Case* the court further observed: "There is certainly no justice in subjecting a person to what is really an unfounded claim, or for preventing him from maintaining an equally well-founded defense, because the evidence discovered by him by which that can be done may be of the same quality or description as that given upon the trial in which he has been defeated." We are of the opinion that the motion for a new trial should prevail; the order denying the same should be reversed; and an order entered setting aside the report of the referee, and the order of confirmation and the judgment entered thereon, and directing a new trial on the payment by the defendants, within 20 days, of the costs allowed by the order and in the judgment; but, if such costs shall not be paid or tendered within that time, then the motion will be denied, and the order affirmed, with costs. Order reversed, and order of confirmation and judgment thereon set aside, and a new trial directed before another referee, on the payment by the defendant within 20 days of the costs allowed by the order and in the judgment, and costs of the appeal before notice of argument, and in default of such payment the order denying the motion for a new trial will be affirmed, with costs, and the judgment and orders affirmed, with costs.

MERWIN, J., (*concurring in result.*) One of the defenses urged at the trial to the note in suit was that it was without consideration, and merely a gift. The form of the note, it being payable 30 days after death of the maker, and not negotiable or on interest, cast doubt upon the existence of a valuable consideration. A loan is not usually secured or a debt paid in that way. Concededly, the plaintiff, the payee, paid nothing. It was, however, claimed by plaintiff that the note was given in place of a similar one made in 1884, and that in a settlement in 1884 between Job Holmes, the maker, and his brother Rufus, the father of plaintiff, the amount of the note was charged by Job to Rufus; so that in substance Job in this way, with the assent of Rufus, retained in his hands an amount of money belonging to Rufus equal to the

amount of the note. No reason for a transaction of this kind was shown. The statement of settlement of that year, that was signed by Rufus and put in evidence by the defendants, shows nothing about it. Presumptively, from the manner in which Rufus and Job made their settlements, there was at the same time a statement signed by Job which would be in the possession of Rufus, and which, according to some of the evidence given on the part of plaintiff, would contain the $2,000 item. No such statement was produced by plaintiff, or its absence accounted for. Nor was Rufus sworn as a witness, although he was accessible, and was shown to have been assisting the plaintiff in preparing the case. Rufus was a competent witness for some purposes, at least, and it was known before the trial, as the plaintiff testified, that the question of consideration would have to be met. The referee found that there was a good and valuable consideration. It may be that there was enough evidence to authorize such a conclusion, but the surrounding circumstances, and the character of the note, left it in a good deal of doubt. Having this in view, as it should be, in determining the importance to be given to the newly-discovered evidence, I am inclined to concur in the conclusion of the presiding justice that there should be a new trial.

MARTIN, J., (*dissenting.*) I agree with my Brother HARDIN that the appeal from the judgment in this case should not prevail. I am also of the opinion that the order denying the appellants' motion for a new trial, on the ground of newly-discovered evidence, should be affirmed. To entitle a party to a new trial on this ground, his papers must show that the new evidence has come to his knowledge since the trial; that his want of such knowledge was not caused by lack of diligence on his part; that the evidence is not cumulative; and that it is of a nature so material that it would probably produce a different result if a new trial were granted. Moreover, on such a motion, there must be an affidavit of the witnesses who will give the new evidence, stating that they are ready to swear to the facts claimed to be newly-discovered. *Adams* v. *Bush*, 1 Abb. Dec. 7. An affidavit that the witness told the party that he would so swear is not sufficient. *Shumway* v. *Fowler*, 4 Johns. 425. The motion in this case was based on the affidavits of 18 persons, who state therein that they have heard the plaintiff, or the defendants' intestate, in the presence of the plaintiff, make statements which are perhaps somewhat inconsistent with the plaintiff's claim in this action. An examination of these affidavits, and of the affidavits used in opposition to the motion, discloses that the affidavits of Joy, Roper, Whitney, Decker, Davis, Baker, and Eckler do not contain any statement that the affiants are ready to swear to the facts claimed to be newly-discovered, and that the witnesses Whitley, Lacey, Davis, Sincebaugh, Eikler, Lewis Westfall, Myron E. Westfall, and Rice have made subsequent affidavits wherein they state that the affidavits made by them, which were read in support of the motion, were made under a misapprehension as to what was stated therein, and, in effect, state that their first affidavits were substantially incorrect. I am of the opinion that none of the affidavits which were contradicted by subsequent ones made by the same persons should be considered, and that the affidavits that were defective in not stating that the affiants would swear to the matters stated therein should be disregarded.

The only affidavits remaining to be considered are those of Starkweather, Herdic, Wright, Ward, and Hull. Starkweather swears that some time in 1885 the defendants' intestate, in a casual conversation with him, said: "I owe no man a dollar in this world, and no man holds any papers against me;" that the plaintiff was present, and did not dissent. Herdic swears that on or about September 16, 1885, the decedent said to him at Candor, in the presence of the plaintiff, "that he was out of debt, and no man had his name on paper." Wright swears that he heard the conversation between Herdic and decedent on

September 16, 1885, and that decedent said "he was out of debt, and no man had his name on paper." Ward swears that the decedent said to him "that he was out of debt, and that no man had his name on paper," and that the plaintiff was present; that at another time decedent told him "that all he owed in the world was twelve dollars;" but the affiant does not state that the plaintiff was present at that time. Mrs. Hull swears that the decedent said to her: "I am out of debt, and owe no one anything but good will, and what there is left is hers, [Eliza's.] Jerome D. Holmes is down taking care of me, and I pay him one dollar per day for his services;" and that the plaintiff was present, and offered nothing to the contrary.

Evidence of the character of that stated in these affidavits would not be admissible against the plaintiff, unless it falls within the rule that, where a person engaged in a conversation with another makes a statement which the other listens to in silence, interposing no objection, when, under the circumstances, the silence is of such a nature as to lead to the inference of assent, such statement may be put in evidence against him. But here the conversation was not with the plaintiff. He, at most, was only present, taking no part in it. If it be admitted that, in a casual, slight, and unimportant conversation between neighbors, the decedent boastingly, mistakenly, or untruly stated that he owed no man anything, can it be said that the plaintiff was required to rudely dispute such a statement, or be bound by his silence? In other words, would silence, under such circumstances, lead to an inference of assent upon his part? It seems to me not. But, if otherwise, it would at best be evidence of very slight value. 2 Whart. Ev. § 1137, and cases cited in note 4. Therefore, if we assume the admissibility of this evidence, its value would be so slight as to be entitled to but little consideration in determining the merits of this motion. The evidence was also cumulative.

Moreover, the statements of these witnesses are not only denied by the plaintiff, but his wife swears that, on the day mentioned by the witnesses Herdic and Wright as the time when they had a conversation with the decedent in the plaintiff's presence, the plaintiff was not in Candor, where the conversation is stated to have taken place, but that he was with her attending a fair at Newark valley, which was several miles distant. There is also evidence which tends to cast a suspicion, at least, upon the propriety of the course pursued by one of the defendants in procuring the affidavits used in support of this motion. In view of the character of the new evidence discovered, its slight value, the denial of its truthfulness, and the rules of law applicable to such motion, I am led irresistibly to the conclusion that the learned judge at special term properly denied the defendants' motion for a new trial. If, however, the affidavits of Joy, Roper, Whitney, Decker, and Baker should not be disregarded as defective, because they do not state that the affiants would swear to the matters therein set forth, still I should be of the opinion that the order should be affirmed, as the new evidence of Joy and Roper is substantially like that of Starkweather and others, which we have already considered, and that of Whitney, Decker, and Baker was only to the effect that the plaintiff said that when his uncle died he would leave him something, and he would pay him well for taking care of him. This evidence I regard of very slight importance in this case. It might well be true, and still not affect the issues between the parties. It seems to me that these affidavits, when all taken together, fall very far short of disclosing evidence which is sufficiently material to justify the granting of a new trial within the rules applicable to such a motion. I think the order denying such motion and the judgment herein should be affirmed, with costs of the appeal from the judgment only.